FILED

07/20/2020

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
June 23, 2020 Session

## IN RE NE'KHIYA M.

**Appeal from the Chancery Court for Shelby County**
**No. CH-19-0406-2   Jim Kyle, Chancellor**

_____

### No. W2019-02223-COA-R3-PT
_____

This is a termination of parental rights case.  Mother and stepfather petitioned the trial court to terminate father's parental rights as to mother's and father's minor child on the ground that he had willfully abandoned the child pursuant to Tennessee Code Annotated section 36-1-102(1)(A).  Additionally, mother and stepfather petitioned that stepfather be allowed to adopt the child.  While it was undisputed that father had abandoned the child, based on his failure to support or visit the child, the trial court found that father had attempted to establish a child support obligation against himself and that he had made numerous, yet unsuccessful, attempts to contact mother in order to visit the child following his release from prison.  Accordingly, the trial court found that father's abandonment was not willful and denied the termination petition.  We affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed and Remanded

ARNOLD B. GOLDIN, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and CARMA DENNIS MCGEE, J., joined

James R. Becker, Jr. and Misty Dawn Morgan Becker, Memphis, Tennessee, for the appellant, Chason H. and Jennifer M.

Laurie Winstead Hall, Memphis, Tennessee, for the appellee, Leon M.

Lori Renee Holyfield, Memphis, Tennessee, Guardian Ad Litem for Ne'Khiya M.

# OPINION

## I. BACKGROUND AND PROCEDURAL HISTORY

Ne'Khiya M.[1] ("the Child") was born on April 13, 2010, to Jennifer M. ("Mother") and Leon M. ("Father"). Both Mother and Father admitted that Father did not sign the Child's birth certificate. Mother testified that it was because Father did not want to be put on child support; similarly, Father testified that, because he was about to be incarcerated, he did not want to return home after years in prison to a large amount of back child support. Prior to the birth of the Child, Father had been convicted of aggravated robbery, aggravated burglary, and employment of a firearm with the intent to commit a dangerous felony. However, because of the birth of the Child, Father's jail sentence and incarceration were postponed approximately three weeks. Before reporting to prison, Father visited the Child one time at Mother's parents' home, during which he brought clothes and diapers. On May 10, 2010, Father reported to prison to serve his sentence.[2] During Father's incarceration, Mother met Chason H. ("Stepfather"), and the two were married on May 7, 2016.

After serving six years and nine months, Father was released from prison on February 22, 2017. Following his release, Father went to Mother's parents' home—the last place where he knew Mother and the Child were living—and left his phone number. By the time Mother called this number, it had been disconnected. In the following months, Father left two additional numbers with Mother's parents, but they were never able to speak by phone. Additionally, Father went to Mother's parents' home many other times trying to locate Mother in his attempt to see the Child.

In or around May 2017, Father visited Shelby County Child Support Services to open a case and to be put on child support. Father also submitted to a DNA test on May 11, 2017. Subsequent to submitting to the DNA test, Father visited Mother's parents' home on an occasion when Mother happened to be there. He spoke to Mother in the front yard and asked about seeing the Child, and he informed Mother about his taking the DNA test and of his desire to have the Child tested. Mother, however, expressed an unwillingness to have the Child tested. When the conversation became "heated", Father left.

On November 30, 2018, Father filed a *pro se* Petition to Establish Parentage in the Shelby County Juvenile Court (the "juvenile court").[3] The initial hearing was held on

---

[1] This Court has a policy of protecting children's identities in parental termination cases. Therefore, when appropriate, we will abbreviate certain names.

[2] The Child was only twenty-seven days old at the time of Father's incarceration.

[3] Appellants argue that, through his Petition to Establish Parentage, Father did not attempt to establish a parent-child relationship because "he only sought to have himself legally declared [the Child's] father and to 'address' her surname." However, in his prayer for relief, Father did ask for "such

January 28, 2019, but the case was continued to March 25, 2019 because a certified copy of the DNA testing results[4] had not been provided to the juvenile court.[5] Prior to the March 25, 2019 hearing before the juvenile court, however, Appellants, on March 19, 2019, filed their Petition for Step-Parent Adoption (the "Petition") in the Shelby County Chancery Court (the "trial court"), requesting that Father's parental rights to the Child be terminated on the ground that he had willfully abandoned the Child pursuant to Tennessee Code Annotated section 36-1-102(1)(A). At the March 25, 2019 hearing on Father's petition, the juvenile court determined that Father was the biological father of the Child. However, the juvenile court did not address the issues of Father's child support obligation or visitation "due to the pending adoption petition in Chancery Court." The juvenile court signed an order to this effect on March 25, 2019, but it was not filed until May 21, 2019.

A trial on the Petition was held on November 7, 2019. Looking at the relevant four-month statutory period—which both parties agreed was from November 18, 2018 to March 18, 2019—the trial court found that Father "neither visited, supported, nor made reasonable payments toward the support of the minor child[.]" However, the trial court also found that, while his attempts were unsuccessful, Father made sincere efforts to visit and support the Child. Specifically, the trial court found as follows:

> Shortly after he was released from prison until March 25, 2019, and arguably until the date of trial, Father made countless attempts to try to visit with the minor child, establish a relationship with her, and set child support. For example, Father submitted himself to a DNA test on May 11, 2017; posted on his Facebook and reached out to Mother's relatives on Facebook; visited Mother's parents' home on multiple occasions to drop off contact information; filed a pro se Petition to Establish Parentage in Juvenile Court; attended the first setting on his Petition on January 28, 2019; filed a Motion for Supervised Visitation with this Court on July 11, 2019; and, according to his testimony, opened a case with Maximus to be placed on child support.

> Father's proof and testimony of his attempts to see and support the minor child were uncontradicted by Petitioners. The proof was clear that Father did not do a successful job in finding the child, and his attempts to see and support the minor child failed. But upon being released from prison after roughly seven years, Father had no support or network to assist him in succeeding in his attempts. In trying to see and support the minor

other relief for which [he] may be entitled."

[4] Mother, approximately 18 months after being requested by Father to do so, eventually took the Child for a DNA test after Father filed his Petition to Establish Parentage in the Juvenile Court.

[5] Significantly, at the January 28, 2019 hearing, Father stated his desire to seek visitation with the Child as well as his willingness to have a child support obligation established against him.

child, Father made all kinds of mistakes in trying to get everything done, but this Court believes trying counts. Effort means as much as success, and this Court will not hold it against Father that his attempts failed.

Further, the trial court noted that "there was no proof at all that Mother did anything to facilitate visitation between the minor child and Father." Accordingly, the trial court determined that Father's abandonment of the Child was not willful and, therefore, denied the Petition. Appellants timely filed this appeal.

## II. ISSUE PRESENTED

While Appellants raise two issues on appeal[6], we believe the dispositive issue in this case to be whether the trial court erred in finding that Appellants had failed to prove, by clear and convincing evidence, at least one ground for termination of Father's parental rights.

## III. STANDARD OF REVIEW

Under both the United States and Tennessee Constitutions, a parent has a fundamental right to the care, custody, and control of his or her child. *Stanley v. Illinois*, 405 U.S. 645, 651 (Tenn. 1972); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996). Thus, the state may interfere with parental rights only when a compelling interest exists. *Nash-Putnam*, 921 S.W.2d at 174-75 (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). Our termination statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g)). A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Because of the fundamental nature of a parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. *Santosky*, 455 U.S. at 769. Accordingly, both the grounds for termination and that termination of parental rights is in the child's best interests must be established by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c)(1); *In re Valentine*, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re M.J.B.*, 140

---

[6] Nevertheless, we address Appellants' specific issues within our discussion of the restyled issue.

S.W.3d 643, 653 (Tenn. Ct. App. 2004). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *Id.*

In view of the heightened standard of proof in termination of parental rights cases, a reviewing court must modify the customary standard of review in Tennessee Rule of Appellate Procedure 13(d). As to the trial court's findings of fact, our review is de novo with a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). We must then determine whether the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

## IV. DISCUSSION

As noted earlier, Appellants petitioned to terminate Father's parental rights on the ground that he had willfully abandoned the Child by failing to visit and by failing to support the Child. Termination of a parent's rights may be initiated based on "[a]bandonment by the parent or guardian, as defined in § 36-1-102[.]" Tenn. Code Ann. § 36-1-113(g)(1). As is relevant here, Tennessee Code Annotated section 36-1-102 provides that "abandonment" mean the following:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(i).[7] As stated above, it is undisputed that, during the relevant statutory period, Father failed to visit, support, and make reasonable payments towards the support of the Child. Therefore, the essential issue on this appeal is whether Father's abandonment of the Child was willful. Here, the trial court concluded that Father was not willful in his abandonment of the Child. As such, we must determine whether the evidence preponderates against the trial court's determination that Father's abandonment of the Child was not willful. Further, we note that, although we review the trial court's findings of fact with a presumption of correctness, the trial court's conclusion that Father's failure to visit and failure to support did not constitute willful abandonment is a question of law, which we review *de novo* with no presumption of correctness. *See In re Catherine J.*, No. W2017-00491-COA-R3-PT, 2018 WL 618703, at *14 (Tenn. Ct.

---

[7] Appellants filed the Petition on March 19, 2019. Accordingly, all versions of the statutes referenced herein are those that were effective on that date.

App. Jan. 30, 2018) (citing *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007)).

Prior to 2018, the statutory definition of abandonment placed the burden of proof on the petitioner to show that the parent's failure to visit or failure to support was "willful." On July 1, 2018, the Tennessee General Assembly amended Tennessee Code Annotated section 36-1-102(1)(A) to remove the element of willfulness from the definition of abandonment by failure to support or visit. Rather than include willfulness as an element of the ground, Tennessee Code Annotated section 36-1-102(1) now provides that it is an affirmative defense:

> For purposes of this subdivision (1), it shall be a defense to abandonment for failure to visit or failure to support that a parent or guardian's failure to visit or support was not willful. The parent or guardian shall bear the burden of proof that the failure to visit or support was not willful. Such defense must be established by a preponderance of evidence. The absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure[.]

Tenn. Code Ann. 36-1-102(1)(I) *enacted by* 2018 Tennessee Laws Pub. Ch. 875 (H.B. 1856), *eff.* July 1, 2018. Here, Appellants filed the Petition on March 19, 2019, and, in his response to the Petition, Father raised lack of willfulness as an affirmative defense. Accordingly, Father had the burden to show, by a preponderance of the evidence, that his failure to visit the Child was not willful. After our review of the record and as explained below, we conclude that Father has satisfied his burden.

We begin our analysis by noting that Father filed a Petition to Establish Parentage on November 30, 2018[8], and he attended the first hearing for the petition on January 28, 2019, during which he expressed his desire to see the Child as well as his willingness to have a child support obligation established against him. While the mere existence of a petition to establish visitation or a child support obligation is not, by itself, conclusive evidence that a parent has not willfully abandoned a child, courts have previously held that a parent who actively pursued such a petition during the relevant four-month period could not be said to have willfully abandoned a child. *See In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007) (concluding that "efforts at maintaining a parent-child relationship to the courts" is inconsistent with a finding of "willful failure to visit as a ground for abandonment."); *see also In re Chelbie*, No. M2006-01889-COA-R3-PT, 2007 WL 1241252, at *1 (Tenn. Ct. App. Apr. 27, 2007).

---

[8] One day prior to his filing the Petition to Establish Parentage, Father made a Facebook post, pleading with anyone who knew Mother to "tell her to have a heart" and to let him see the Child. Additionally, Father stated in the Facebook post that he had not "had [the] chance to love on my 1st baby" and that he was "really lost" and "[did not] know where to turn[.]"

For example, in *In re Chelbie F.*, the father, for approximately seven years, neither visited nor financially supported his child. *In re Chelbie*, 2007 WL 1241252, at *1. Eventually, the father filed a petition to establish visitation and child support. *Id.* However, this proceeding was preempted when the child's mother and stepfather filed a petition to terminate the father's parental rights, which the chancery court granted upon finding the father had abandoned the child by willfully failing to support or visit her. *Id.* at *2. On appeal, we reversed, finding as follows:

> It is undisputed, however, that Kenneth F. filed a petition in the Chancery Court for Hamilton County on March 22, 2005 seeking the court's assistance in establishing his visitation and his support obligation. It is also undisputed that Anita G. had been served with process and that Kenneth F. was actively pursuing his petition when Anita G. and Gary G. filed the petition to terminate his parental rights. In fact, it is undisputed that the parties were in the middle of the hearing on Kenneth F.'s petition when word came that the petition to terminate his parental rights had been filed in Bedford County and that the proceedings in Hamilton County were immediately suspended as a result of the filing of the petition in Bedford County.

*Id.* at *6. Based on these facts, we determined that the father's "pursuit of a judicial remedy is inconsistent with a finding that he willfully failed to support or visit Chelbie F. during the four months immediately preceding the filing of the petition." *Id.*

Like the father in *In re Chelbie F.*, Father, here, was actively pursuing a judicial remedy to establish visitation and child support during the relevant four-month statutory period and, thus, prior to Appellants' filing their Petition. Appellants, however, argue on appeal that, in Father's petition to establish parentage, "[h]e did not ask for a visitation schedule and he did not ask to pay child support." We disagree. First, Father filed his Petition to Establish Parentage *pro se*. As we have previously held, "[t]he courts give *pro se* litigants who are untrained in the law a certain amount of leeway in drafting their pleadings and briefs." *Young v. Barrow*, 130 S.W.3d 59, 63 (Tenn. Ct. App. 2003). Accordingly, "we measure the papers prepared by *pro se* litigants using standards that are less stringent than those applied to papers prepared by lawyers." *Id.* A review of Father's petition to establish parentage reveals that he specifically prayed "[f]or such other relief for which [he] may be entitled[.]" Secondly, at the initial hearing on his petition, when asked his purpose for filing the petition, Father responded as follows: "[I]t was going to give me the right to say [the Child] was my daughter and put myself on child support. That's what I was hoping to establish, some type of visitation, some type of legal – that I was her legal guardian. Her father."[9] Therefore, we find Appellants'

---

[9] Further, since his release from prison, Father had been to Shelby County Child Support Services on multiple occasions in an attempt to put himself on child support.

argument that Father did not properly request to establish a visitation schedule or child support obligation without merit. As we held in *In re Chelbie F.*, Father's pursuit of a judicial remedy is inconsistent with a finding that he willfully failed to support or visit the Child during the relevant statutory period.

In addition to his pursuit of a judicial remedy, Father made numerous—albeit unsuccessful—attempts to visit and support the Child since his release from prison. While some of these events occurred outside the relevant four-month statutory period, this Court has previously noted that "courts often must consider the parent's actions *outside* the four-month period in order to assess the willfulness of the parent's actions *within* the pivotal four-month period, as 'part of the constellation of facts that must be considered to assess willfulness.'" *In re Adoption of Marissa O.R.*, No. W2013-01733-COA-R3-PT, 2014 WL 2475574, at *14, fn. 12 (Tenn. Ct. App. May 30, 2014) (emphasis in original) (quoting *In re Kaleb N.F.*, No. M2012-00881-COA-R3-PT, 2013 WL 1087561, at *23 (Tenn. Ct. App. Mar. 12, 2013)). Accordingly, "[t]he question of intent or willfulness depends on the totality of the circumstances." *In re J.G.H., Jr.*, No. W2008-01913-COA-R3-PT, 2009 WL 2502003, at *15 (Tenn. Ct. App. Aug. 17, 2009).

Here, in March of 2017—just one month after his release from prison—Father went to Shelby County Child Support Services ("SCCSS") to open a case. Father testified it was his understanding that, by opening a case with SCCSS, he would be better able to see and support the Child:

Q: Okay. And so you went to open up a case?
A: Yes, ma'am.
Q: And by "a case," what did you understand that to mean?
A: I understood that I basically would have to submit my DNA test to basically try to get some type of visitation and put myself on child support.
Q: Okay. And so you understood that by going and doing that, all of that ultimately would take place?
A: Yes.

In addition to opening up a case with SCCSS, Father reached out to a number of Mother's relatives on social media in an attempt to ascertain her and the Child's whereabouts. For example, on July 3, 2018, Father made a Facebook post in which he asked, "If [a]nybody know [sic] [Mother] please tell her I want to see my child[.]" Similarly, on July 27, 2018, Father posted on Facebook a picture of Mother with the following caption: "[I]f you seen [sic] her or know her tell her to have a [heart][10] and let me see my child[.]" That same day, Father also messaged Mother's cousin on Facebook: "I don't know you but I just want to see my daughter so can you contact your cousin[.] I don't know any other way to contact her[.]" Father, however, received no response. On

---

[10] In the original Facebook post, Father used a heart emoticon.

July 30, 2018, Father messaged Mother's sister on Facebook, notifying her that he could not get in contact with Mother and that he wanted to see the Child. Again, however, Father received no response. On November 29, 2018—notably within the relevant four-month period—Father made yet another Facebook post in which he pleaded with anyone who knew Mother to inform her that he wished to see the Child.

Father also visited Mother's parents' home on multiple occasions following his release from prison. Mother, however, had moved out of her parents' home and into a home with Stepfather in December 2015, while Father was still incarcerated. Father, however, testified that he was never given a new address or telephone number for Mother, and Mother testified that she had never given him any form of contact information, either. Nevertheless, Father left three separate telephone numbers at Mother's parents' home. Mother called the first number, but it had been disconnected. Mother attempted to call the second and third numbers as well, but Father never answered because the calls came from a private number. A parent's failure to visit or support a child is willful when that parent "is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." *In re Adoption of Muir*, 2005 WL 3076896, at *5. Based on the foregoing, it would strain credulity to hold that Father made no attempts to visit and support the Child.

Appellants also argue on appeal that the trial court erred in finding that they had an "affirmative obligation" to facilitate Father's obligations to visit and support the Child. However, after our review of the final order, we determine that the trial court made no such finding. Specifically, the trial court found as follows:

> Through her testimony, Mother argued she did not stonewall, but she did not testify that she did anything to make it easier for Father to see the child. Therefore, Mother neither did anything to facilitate the visitation nor did she do anything to prevent it . . . .

> As previously stated, Father made multiple attempts to get into contact with Mother. Mother did not contradict these instances or attempts because there is no denying Father did do them; all of his attempts just did not lead to the minor child. Mother may not have known of all of Father's attempts to see the minor child or all of the steps he was taking to establish some sort of relationship, visitation, or child support, but it can be said that it was because she did not want to know.

An offhand reference to the fact that Mother did nothing to facilitate the relationship between Father and the Child is inconsistent with a finding that she had an affirmative obligation to do the same. Rather, we conclude that the trial court's finding alludes more so to the often-quoted rule that the failure to visit or to support "is not excused by another person's conduct unless the conduct actually prevents the person with the obligation from

performing his or her duty or amounts to a significant restraint or interference with the parent's efforts to support or develop a relationship with the child." *In re Audrey S.*, 182 S.W.3d 838, 864 (Tenn. Ct. App. 2005) (internal citations omitted).[11] After our review of the record, we conclude that Mother's own testimony indicates that she interfered with Father's efforts to develop a relationship with the Child. For example, in October 2017, Father spoke with Mother in her parents' front yard and expressed his desire that he and his family be allowed to visit the Child. Mother, however, refused. At trial, Mother testified that, "at that time I didn't feel like it was his decision to say when he could step back in." Additionally, she testified that "[i]t was just something that I felt like he shouldn't have control over anymore because he had his opportunity to do what he needed to do if he wanted to be a part of [the Child's] life." Further, as to the efforts Father made following his release from prison, Mother testified as follows:

> Q: [W]hy do you think that [Father] went to [SCCSS] and opened a case and did the DNA test if not to see [the Child] and establish legal rights to her?
> A: Honestly, I'm not sure. That's why I was thrown off. Because when [the Child] was born his words to me were that he didn't want to be put on child support, that was why he didn't sign the birth certificate, and he wasn't trying to do all of that[.]
> Q: Well, even assuming that testimony is true, you understand that this was several years later. And is it your testimony under oath that you really don't know why he went to all that trouble?
> A: I don't because that's where we left off at, so that's all I have to go by.

Overall, Mother was aware that Father was taking steps in order to develop a relationship with the Child. However, by her own testimony, she believed that allowing Father to develop a relationship with the Child "was just something that . . . he shouldn't have control over anymore[.]" Mother's interference with Father's efforts to support or develop a relationship with the Child, as well as Father's pursuit of a judicial remedy to establish a visitation schedule and child support obligation during the relevant four-month period, are inconsistent with a finding that he willfully failed to support or visit the Child. Accordingly, we conclude that the record does not contain clear and convincing evidence that Father willfully abandoned the Child pursuant to Tennessee Code Annotated section 36-1-113(g)(1).

---

[11] Conduct that amounts to a significant restraint or interference with a parent's efforts to support or develop a relationship with a child includes, but is not limited to: "(1) telling a man he is not the child's biological father; (2) blocking access to the child; (3) keeping the child's whereabouts unknown; (4) vigorously resisting a parent's efforts to support the child; or (5) vigorously resisting a parent's efforts to visit the child." *Id.* at 864, fn. 34.

## VI. CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed

_____
ARNOLD B. GOLDIN, JUDGE